UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

———————————————————————————

CHARLES WATSON,

                              Plaintiff,

            v.

                                              9:08-CV-62
DR. LESTER WRIGHT, Chief               (NAM/ATB)
   Medical Officer, DOCS; and
DOYON DE AZEVEDO,
   FHSD, Clinton CF,

                              Defendants.

———————————————————————————

CHARLES WATSON, Plaintiff *Pro Se*
AARON M. BALDWIN, Asst. Attorney General, for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

### REPORT-RECOMMENDATION

This matter was referred to me for Report and Recommendation by the

Honorable Norman A. Mordue, Chief United States District Judge, pursuant to 28

U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

The Second Amended Complaint alleges that defendants Wright and de

Azevedo denied plaintiff constitutionally adequate medical care while he was in the

custody of the New York  Department of Correctional Services ("DOCS").[1]  Plaintiff

seeks monetary relief as to these defendants.  (2d Am. Compl. ("AC"), Dkt. No. 40 at

———————————

[1] On April 1, 2011, DOCS and the New York State Division of Parole were merged into one agency, named the New York State Department of Corrections and Community Supervision. Because the events relevant to this suit occurred before the merger, I will refer to New York State's corrections agency as "DOCS."

11-12).[2]

Presently before the court is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56.  (Dkt. No. 92).  Plaintiff has opposed the motion (Dkt. No. 96), and the defendants filed a reply (Dkt. No. 98).  For the following reasons, this court will recommend granting the defendants' motion for summary judgment and dismissing the remaining claim in the Second Amended Complaint.[3]

## DISCUSSION

I.   **Background/Facts**

The Second Amended Complaint alleges that Lester N. Wright, the DOCS Chief Medical Officer, and  Doyon de Azevedo, the Facilities Health Services Director ("FHSD") at Clinton Correctional Facility ("Clinton") violated plaintiff's Eighth Amendment rights by their "deliberate indifference" in interrupting his treatment for Hepatitis-C for two weeks in January 2005.  (AC, Dkt. No. 40 at 11).  Hepatitis-C is an infectious disease affecting the liver, caused by the Hepatitis-C virus ("HCV").  (de

---

[2] The court will cite to page numbers assigned by the Case Management/Electronic Case Filing system to the extent it seems necessary to pinpoint the reference to the record.

[3]  Plaintiff's Eighth Amendment medical claims against defendants de Azevedo and Wright survived defendants' prior motion to dismiss.  (Dkt. Nos. 53, 60).  The Second Amended Complaint also included an unrelated claim for injunctive relief against  Karen Bellamy, the Director of the DOCS Inmate Grievance Program, which was dismissed by Chief Judge Mordue in response to the motion to dismiss.  (Dkt. Nos. 60, 89).  The earlier procedural history of this case is cogently summarized in the Report-Recommendation of Magistrate Judge Di Bianco addressing the motion to dismiss.  (Dkt. No. 53 at 2-3).  The case was re-assigned to me on January 4, 2010, following Judge Di Bianco's retirement.

Azevedo Decl. ¶ 5, Dkt. No. 92-2).[4]

## A.    DOCS HCV Guidelines

Treatment of HCV within DOCS correctional facilities is governed by the *Hepatitis-C Primary Care Practice Guideline*, established by the DOCS Chief Medical Officer.  (de Azevedo Decl. ¶ 5).  Such clinical practice guidelines are implemented in an effort to maintain consistency of care throughout the DOCS system, and to stay current with scientific advances.  (*Id*. ¶ 6).  Such protocols are developed by those having particular expertise as to the most efficacious treatment modalities to provide other DOCS practitioners with guidance as to the standards of health care adopted in the institution.  (*Id*. ¶ 7).

DOCS medical guidelines are developed in consultation with task forces of physicians and other health professionals, including DOCS practitioners and experts from academic medical colleges and hospitals, who consider national guidelines, consensus statements, and recommendations, as well as well-grounded articles in peer-reviewed medical journals.  (de Azevedo Decl. ¶ 6).  The initial *Hepatitis-C Primary Care Practice Guideline* used by DOCS was revised several times with the

---

[4] The background facts stated herein are drawn largely from defendants' Statement Pursuant to Rule 7.1 (a)(3) (Dkt. No. 92-3), which in turn relies heavily on the Declaration of Dr. de Azevedo  (Dkt. No. 92-2) and the documentation cited therein.  Unless otherwise indicated, plaintiff did not object to the stated facts in his Statement of Disputed Material Facts (Dkt. No. 96 at 2-5).  To the extent plaintiff did not specifically controvert facts stated in defendants' Rule 7.1 (a)(3) statement, they may be deemed admitted under our local rules.  *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (the liberal standards applicable to *pro se* litigants does not excuse them from following the procedural formalities of summary judgment).

evolution of care and treatment of this disease and with advancements made with research and study.  (*Id*. ¶ 8).  The "Guidelines" relevant to this case are dated July 2004.  (*Id*.; Deft.s' Exh. A, Dkt. No. 92-4).  The Guidelines are based upon, *inter alia*, *Recommendations for Prevention and Control of Hepatitis-C Virus (HCV) Infection and HCV-Related Chronic Disease* from the U.S. Centers for Disease Control and Prevention ("CDC") (October 16, 1998) (Deft.s' Exh. B, Dkt. No. 92-5) and the *NIH Consensus Statement on Management of Hepatitis-C: 2002* ( Deft.s' Exh. C, Dkt. No. 92-6).  (de Azevedo Decl.¶ 9).

According to Dr. de Azevedo, DOCS Guidelines on the treatment of HCV take into account the complexity of the disease, treatment modalities and their success rates, and the potential side effects and complications of treatment.  (de Azevedo Decl. ¶12).  The success rate of treatment for Hepatitis-C has been relatively low.  (*Id*. ¶ 13).  To a great extent, success in the treatment of HCV depends upon unique factors, such as the body chemistry of an individual patient, the genotype of the virus, other conditions from which the patient may be suffering, and individual behaviors.  (*Id*.).  Success in the context of HCV treatment is usually defined as a "sustained viral response" ("SVR"), in which a patient maintains undetectable viral levels for a period of at least 24 weeks after concluding drug therapy.  Even in such patients, however, there is a distinct possibility of relapse.  (*Id*. ¶ 14).

During the 1990s, researchers discerned that combined treatment with interferon

4

and ribavirin appeared to be effective in reducing viral loads in many HCV patients. (de Azevedo Decl. ¶ 15).  The effectiveness of this treatment improved with the advent of "pegylated interferon," a modified version of the drug which remains in the body tissues for a longer period of time.  Treatment with pegylated interferon and ribavirin was approved by the U.S. Food and Drug Administration ("FDA") in 2001.  (*Id*.).

Even with this state-of-the-art therapy, varying percentages of patients achieve sustained viral response, depending on genotype of the virus and other factors.  (de Azevedo Decl. ¶ 16).  Anti-HCV therapy is more effective against genotypes 2 and 3–sustained response rate in the range of 70-80%–versus genotype 1–sustained response rate in the range of less than 30% to 50%.  (*Id*. ¶ 17; Deft.s' Exh. B at 15; Deft.s' Exh. C at 18).  African American males with genotype 1 HCV have a much lower sustained response rate, estimated to be in the range of only 19%.  (*Id*. ¶ 18).[5]

According to Dr. de Azevedo, all HCV treatment decisions require an analysis of the risks to the patient from the treatment versus the likely benefit to be obtained from treatment.  (de Azevedo Decl. ¶ 19).  Treatment with pegylated interferon and ribavirin involve significant possible side effects and serious risks of complications, which include thyroiditis, hyperthyroidism and hypothyroidism, anemia, cardiac decompensation, renal failure, pneumonitis, severe bone marrow suppression, and

---

[5] See also *Reviews–Racial Disparity in Liver Disease. . .*, Hepatology, Vol. 47, No. 3 (2008) at 1061.  (Deft.s' Exh. E, Dkt. No. 92-8 at 4).

suicidal depression.  (*Id.* ¶ 20; Deft.s' Exh. A at 5-6).  Dr. de Azevedo asserts that an especially cautious approach to anti-HCV therapy is medically appropriate in light of these risks, the relatively low rate at which Hepatitis-C infection leads to liver failure and/or death, the slow rate of the disease's progression, and the relatively low success rate of treatment.  (*Id.* ¶ 21).  Accordingly, the DOCS Guidelines establish certain criteria and prerequisites which must be satisfied before anti-HCV treatment can begin, after being approved by the Chief Medical Officer on a case-by-case basis.  (*Id.* ¶ 22; Deft.s' Exh. A at 3-5).

The HCV Guidelines also provide that the duration of anti-HCV therapy to be administered by DOCS is to be determined based on the HCV genotype, human immunodeficiency virus ("HIV") status, and the inmate patient's initial response to therapy.  (de Azevedo Decl. ¶ 23).  In particular, the Guidelines state: "The length of anti-HCV treatment depends on the patient's HCV genotype and week 12 response to therapy."  (*Id.* ¶ 24; Deft.s' Exh. A at 6).  The Guidelines provide that, after twelve weeks of treatment, a quantitative HCV RNA (viral load blood count by laboratory testing) should be obtained.  A "favorable response [to treatment] is indicated by an undetectable HCV RNA or a 2-log (100-fold) or greater reduction in HCV RNA."  (de Azevedo Decl. ¶ 25; Deft.s' Exh. A at 6-7).  The Guidelines go on to state, for patients with genotype 1 HCV:

If the patient has an undetectable HCV RNA and . . . is genotype 1 , . . .

6

treatment should continue for a total of 48 weeks. . .  If the patient is not
undetectable after 12 weeks of treatment, but has had at least 2-1og reduction
(100-fold) in HCV RNA, then continue treatment for another 12 weeks . . .

(de Azevedo Decl. ¶ 26; Deft.s' Exh. A at 7).  The "Length of Anti-HCV Treatment"

table attached to the DOCS Guidelines provides that, if the patient has genotype 1 and

the virus is still detectable after twelve weeks, without at least a two-log drop in viral

load, then "Stop Rx," or discontinue medication.  (de Azevedo Decl ¶ 27; Deft.s' Exh.

A, Dkt. No. 92-4 at 20).

The two-log or 100-fold decrease requirement to continue therapy beyond

twelve weeks is not unique to DOCS, but is based upon national standards and is in

accordance with, for example, the Federal Bureau of Prisons' ("BOP") guidelines on

the issue.  (de Azevedo Decl. ¶ 28; Deft.s' Exh. F at 12, Dkt. No. 92-9 at 16).[6]  The

*National Institutes of Health Consensus Statement-Management of Hepatitis-C: 2002*

provides that:

> Early viral response (EVR), defined as a minimum 2 log decrease in viral load
> during the first 12 weeks of treatment, is predictive of SVR [sustained viral
> response] and should be a routine part of monitoring patients with genotype 1.
> Patients who fail to achieve an EVR at week 12 of treatment have only a small
> chance of achieving an SVR even if therapy is continued for a full year.
> Treatment need not be extended beyond 12 weeks in these patients.

(de Azevedo Decl. ¶ 29; Dft.'s Exh. C at 18).

---

[6] The Federal BOP guideline explains that viral response at week twelve is "closely
correlated with treatment success" and that "failure to achieve an EVR [at least a two-log
decrease in HCV RNA] at twelve weeks is considered treatment failure.  Treatment should be
discontinued."  (*Id.*)

**B.     Plaintiff's Anti-HCV Treatment**

Plaintiff is an African-American male who was diagnosed as suffering from genotype 1 of the Hepatitis-C virus.  (de Azevedo Decl. ¶ 32).  In the spring of 2004, after a number of preliminary tests, plaintiff was evaluated for possible anti-HCV treatment by the Clinton medical staff and an outside gastroenterology consultant, Dr. Ashley.  (*Id*.).  Dr. Ashley recommended treatment with a regimen of pegylated interferon (trade name Pegasys) and ribavirin (trade name Copegus) per "protocol." (*Id.* ¶ 33; Deft.'s Exh. G (Medical Records), Dkt. No. 93 at 31).[7]  On June 2, 2004 Dr. Kang M. Lee, a facility physician at Clinton, ordered a regimen of Pegasys and Copegus for plaintiff, and directed that a viral load assessment be made at the three-month point–after twelve weeks.  (de Azevedo Decl. ¶ 34; Dkt. No. 93 at 1).  After all prerequisites for treatment under the DOCS Guidelines were satisfied, anti-HCV treatment was then approved by the DOCS Chief Medical Officer.  (de Azevedo Decl. ¶ 36).  Plaintiff's treatment with Pegasys/Copegus started with an injection in early October 2004, and continued with weekly injections until January 14, 2005.  (*Id.* ¶ 37; Dkt. No. 93 at 88, 90-92).

On November 30, 2004, Dr. McDermott, a consulting gastroenterologist, noted

---

[7] Dr. Ashley's 5/28/04 consultant's report stated that plaintiff's viral load should be checked at twelve weeks, and "need 1 log drop to continue."  (*Id.*; AC ¶ 9).  Dr. de Azevedo notes that the twelve-week benchmark recommended by Dr. Ashley for continuing the anti-HCV medication differed from the protocol used by DOCS, which requires a two-log drop at that point.  (de Azevedo Decl. ¶ 33).

that, after eight weeks of anti-HCV treatment, lab results reporting plaintiff's viral levels demonstrated a "partial response to Hep C Rx, but nowhere close to 2-log drop" referenced in the DOCS Guidelines.  (de Azevedo Decl. ¶¶ 38-39; Dkt. No. 93 at 32).[8] Plaintiff claims that he was told that Dr. McDermott would recommend continuation of treatment beyond twelve weeks based on the decrease in plaintiff's viral load, but no such recommendation is reflected in the applicable medical records.  (Pltf.'s Decl. ¶ 4, Dkt. No. 96 at 7; Dkt. No. 93 at 32).  Plaintiff experienced some side effects, secondary to the anti-HCV medication, including periods of increased fatigue and itching.  (Pltf. Decl. ¶¶ 5-6; Dkt. No. 93 at 32, 96).

On December 22nd, plaintiff reported to emergency sick call, complaining of shortness of breath and profuse sweating, after carrying his property up two flights of stairs.  (Pltf.'s Decl. ¶ 5).  Plaintiff was assessed by the on-call nurse, who determined that he did not have any shortness of breath or diaphoresis, and had normal blood pressure, pulse, and heart rate, with oxygen saturations well within normal limits, at 98%.  The nurse instructed Watson to "sign up for non-sick call to address any issues–this is not emergent."  (Dkt. No. 93 at 11; de Azevedo Decl. ¶ 48).  According to the nurse, plaintiff then became verbally abusive and demanded to see Dr. de Azevedo, who was sitting at a desk nearby.  Dr. de Azevedo states that, when he

---

[8]  Plaintiff's viral levels dropped from pre-treatment levels of 3,006,311 copies/mL and 578,137 IU/mL to 1,027,477 copies/mL and 197,542 IU/mL at the 8-week mark.  (*Id.*).

attempted to speak with the plaintiff, the inmate responded with profanity, at which

time the interview was terminated.  (Dkt. No. 93 at 11; de Azevedo Decl. ¶ 49).

Plaintiff claims that Dr. de Azevedo made a racially derogatory remark, which

prompted plaintiff's profanity. (Pltf.'s Decl. ¶ 6).  The doctor denies making any

racially derogatory remark.  (de Azevedo Decl. ¶ 51).  Plaintiff was issued a

misbehavior report and was ultimately disciplined for the incident.  (Pltf.'s Decl. ¶ 8).

Plaintiff claims that, on the day of the incident, he filed three grievances, including

one against Dr. de Azevedo for discriminatory conduct.  (Pltf.'s Decl. ¶ 7 & n.1).[9]

Plaintiff had his twelfth weekly injection of anti-HCV on December 24, 2004.

(de Azevedo Decl. ¶ 41; Dkt. No. 93 at 90-92).  According to Dr. de Azevedo, at the

twelve-week mark, it was appropriate, and required by DOCS Guidelines, to have

plaintiff's viral load checked, assess his response to therapy, and make a determination

as to whether treatment should continue.  (de Azevedo Decl. ¶ 42).  On December 28,

2004, Dr. de Azevedo wrote in Plaintiff's Ambulatory Health Record ("AHR") that

plaintiff's viral load should be assessed that week, adding, consistent with the DOCS

Guideline, "**if** detectable" or "no 2 log [decrease] D/C [discontinue] Pegasys."  (*Id*. ¶

---

[9] Although there is a record of two other grievances filed by plaintiff on December 22nd,
there is no documentation of a grievance filed on that date alleging discriminatory conduct by
defendant de Azevedo.  Well after plaintiff learned that Dr. de Azevedo planned to terminate
plaintiff's anti-HCV medication, plaintiff purportedly "re-submitted" the grievance alleging a
racially derogatory remark by the doctor.  (*Id*.; Pltf.'s Exh. G, Dkt. No. 96-1 at 28-30).  In a
12/29/2004 letter to defendant Wright complaining about the impending termination of his anti-
HCV treatment, plaintiff claims he previously submitted a grievance against Dr. de Azevedo.
(Pltf.'s Exh. J, Dkt. No. 96-2 at 5-6).

43; Dkt. No. 93 at 13) (emphasis added). Defendant de Azevedo states that he became involved in plaintiff's care at that time, because he was the attending physician on duty with whom plaintiff's chart was left to arrange lab work. (de Azevedo Decl. ¶ 45).[10] Defendant de Azevedo also noted that plaintiff's medical records indicate that, on or about December 6, 2004, plaintiff requested a call-out with the "FHSD"– Facilities Health Services Director de Azevedo–to discuss "numerous medical issues." (de Azevedo Decl. ¶ 46; Dkt. No. 93 at 10).

Plaintiff alleges that, although the incident with Dr. de Azevedo on December 22, 2004, had nothing to do with his treatment, he had a "foreboding feeling" that defendant de Azevedo was "about to interfere with [his] treatment in a negative manner." (AC ¶ 12). Plaintiff alleges that, on December 27, 2004, when he went to the laboratory for his routine bi-weekly blood test, he was told that his viral load would be checked in January of 2005. (AC ¶ 11). He was called to the laboratory three days later, on December 30th, and allegedly told that the viral load test was ordered "ASAP" by Dr. de Azevedo. (*Id.*). Plaintiff alleges that he was "greatly disturbed" because defendant de Azevedo had not previously been involved in

---

[10] Plaintiff claims "there is no such thing in DOCS as an attending physician on duty for non-emergent care," and asserts that Dr. Lee was his assigned primary care doctor. (Dkt. No. 96 at 2-3).

plaintiff's treatment.[11]  (AC ¶ 12).  On **December 31, 2004**, plaintiff received his weekly interferon injection and claims he "was informed by the medication nurse" that it would be his last.  (AC ¶ 13).  Plaintiff states that upon learning of this "premature order to terminate treatment," before lab results on his viral load were available, plaintiff wrote to defendant Dr. Wright and the DOCS Commissioner protesting the "impending" termination by Dr. de Azevedo.  (AC ¶ 14).[12]

Lab work that was initiated on December 30, 2004 resulted in a report dated January 3, 2005, showing that plaintiffs HCV RNA viral load had decreased from 3,006,311 to 137,099 copies/mL and from 578,137 IU/mL to 26,365 IU/mL.  (de Azevedo Decl. ¶ 52; AC ¶ 15).  This corresponded to a 1.34-log drop, below the two-log (or 100-fold) drop that would be required to continue treatment in accordance with DOCS guidelines.  (de Azevedo Decl. ¶ 53).  Nonetheless, Dr. Lee, plaintiff's primary treating physician, reviewed the lab work and, on January 7, 2005, wrote in the chart to "continue present meds."  (*Id.* ¶ 54; AC ¶ 15; Dkt. No. 93 at 14).  Plaintiff received his anti-HCV injection on that day.  (AC ¶ 15).

Plaintiff alleges that on January 10, 2005, he received an answer to his December 29, 2004 letter from Dr. Wright, stating that Dr. Wright would defer to Dr.

---

[11] Plaintiff acknowledges that he requested to see Dr. de Azevedo on December 6, 2004. (Dkt. No. 96 at 3).

[12] In his letter of complaint to Dr. Wright, plaintiff claimed he was told on **12/29/2004** that Dr. de Azevedo would stop his medication.   (Pltf.'s Exh. J, Dkt. No. 96-2 at 5-6).

de Azevedo's decisions regarding plaintiff's medical care.  (AC ¶ 16).[13]  Defendant de

Azevedo reviewed plaintiff's lab work and chart, and then discussed the case with Dr.

Wright.  (de Azevedo Decl. ¶ 55).  Plaintiff alleges that, on January 14, 2005, he was

seen by Dr. de Azevedo, for the first time since plaintiff's arrival at Clinton, two years

earlier.  (AC ¶ 17).  Dr. de Azevedo told plaintiff that, notwithstanding  Dr. Lee's

decision to continue plaintiff's treatment, his medication was being discontinued

because plaintiff did not achieve a sufficient (two-log) decrease in viral load under the

DOCS Guidelines.  (*Id.*; de Azevedo Decl. ¶¶ 55-56).  Plaintiff did not receive any

Interferon for two weeks, between January 14 and January 27, 2005.  (AC ¶ 20).

The Second Amended Complaint alleges that, on January 28, 2005, Dr. de

Azevedo "inexplicably" resumed plaintiff's treatment for another twelve weeks.  (AC

¶ 21).  In his declaration, Dr. de Azevedo explained that, due to plaintiff's continuing

protestations about the decision to terminate his anti-HCV treatment, the FHSD

arranged to discuss plaintiff's case with the consultant, Dr, McDermott.  (de Azevedo

Decl. ¶ 57).  The consultant recommended, on January 28, 2005, that plaintiff's

treatment should be continued, despite the failure to meet the two-log benchmark set

by the DOCS Guideline. (*Id*. ¶ 58; Dkt. No. 93 at 15).  In his January 28th progress

---

[13] The January 10, 2005 letter was from a DOCS Regional Health Care Administrator
("RHCA"), to whom Dr. Wright delegated the responsibility to respond to plaintiff's complaints.
The RHCA noted that plaintiff would see a facility physician in the near future and could share
his concerns with that doctor.  (Pltf.'s Exh. M, Dkt. No. 96-2 at 22).

note, Dr. McDermott wrote that, in light of plaintiff's "significant" partial response to PEG IFN [and] Ribavirin, which "barely misses" the two-log drop, plaintiff should continue treatment to 24 weeks, at which point his viral load should be reassessed. (Dkt. No. 93 at 28).  Dr. de Azevedo also consulted with Dr. Hentschel, the DOCS Regional Medical Director, and eventually with Dr. Wright.  (de Azevedo Dec. ¶ 59). Based on those consultations, Dr. de Azevedo decided not to strictly adhere to the Guidelines and to allow plaintiff to resume treatment for another 12 weeks.  (*Id*. ¶ 60).

Plaintiff's injections resumed on January 28, 2005, and he received weekly anti-HCV medication and periodic monitoring through the 24-week mark, until May 12, 2005.  In May 2005, plaintiff's medication was discontinued because his viral load, reflected in laboratory results, showed that he was no longer responding to treatment. (de Azevedo  Decl. ¶ 62).

Plaintiff notes that, shortly after the two-week delay in his treatment, lab results showed that his viral load "skyrocketed," and remained "astronomical" through the final termination of his treatment.  (AC ¶ 21; Pltf.'s Decl. ¶ 18; Pltf.'s Exh. O, Dkt. No. 96-2 at 25-29).  Although he cites no medical evidence other than the increase in his viral load, plaintiff attributes the failure of his treatment, and the alleged hastened deterioration of his liver, to Dr. de Azevedo's two-week interruption of plaintiff's medication.  (AC ¶ 20; Pltf.'s Decl. ¶ 21).  Plaintiff claims that defendant Dr. de

14

Azevedo "achieved his goal" of ensuring the failure of plaintiff's anti-HCV treatment.

(AC ¶ 21).

Dr. de Azevedo states that his treatment decisions regarding the plaintiff

constituted an exercise of medical judgment based upon the following factors: (1)

plaintiff's low likelihood of treatment success to begin with; (2) the possibility of side

effects (of which plaintiff experienced a few), if treatment were to continue; (3) lab

work showing the lack of a two-log decrease in viral load after twelve injections,

which is predictive of and considered treatment failure; (4) DOCS Guidelines

requiring at least a two-log decrease in viral load at twelve weeks to continue

treatment, which Guidelines are based upon national standards/recommendations and

are in accord with the Federal Bureau of Prisons guidelines on the issue, and (5) one

specialist's (Dr. McDermott's) initial use of the two-log decrease benchmark.  (de

Azevedo Decl. ¶ 64).  Dr. de Azevedo denies that his treatment decisions were

influenced by his interaction with plaintiff on December 22, 2004, or were based on

any "non-medical discriminatory animus" or "retaliatory intent," as alleged by

plaintiff.  (de Azevedo Decl.¶¶ 47, 50-51, 63).  Dr. de Azevedo asserts that, based on

the factors outline above, it was also objectively reasonable for him to believe that

discontinuing plaintiff's medication at the twelve-week treatment mark, did not violate

plaintiff's constitutional right to medical treatment.

## II.    Summary Judgment–Legal Standards

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact.  FED. R. CIV. P. 56[14]; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990).  "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment."  *Salahuddin v. Coughlin*, 674 F. Supp. 1048, 1052 (S.D.N.Y. 1987) (citation omitted). A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [fact finder] could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); FED. R. CIV. P. 56 (c)(1)(A).  If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  In determining

---

[14] Rule 56 was extensively amended, effective December 1, 2010.  As the Advisory Committee Notes indicate, "the standard for granting summary judgment remains unchanged." The revised rule explicitly adopts procedures relating to summary judgment motions "consistent with those already used in many courts."

whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247-48.

"[I]n a pro se case, the court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (citing, *inter alia*, *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994) (a court is to read a pro se party's "supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest")). "However, a pro se party's "bald assertion," completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir.1991)).

## III.  Deliberate Indifference to Medical Needs

### A.    Legal Standards

In order to state an Eighth Amendment claim based on constitutionally

inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  There are two elements to the deliberate indifference standard. *Smith v. Carpenter*, 316 F.3d 178, 183–84 (2d Cir. 2003).  The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind.  *Id.* at 184 (citing inter alia *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.'  *Bellotto v. County of Orange*, 248 F.App'x 232, 236 (2d Cir. 2007) (quoting  *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006)).  If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious."  *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003).  When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather

than the prisoner's underlying medical condition alone." *Id*. at 185.   The standard for determining when a deprivation or delay in a prisoner's medical need is sufficiently serious, contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto v. County of Orange*, 248 F.App'x at 236 (citing *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir.1998) and *Smith v. Carpenter*, 316 F.3d at 187 (actual medical consequences are highly relevant)).

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).  A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose  of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id*. at 835, 837.  The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan*, 511 U.S. at 844.  Thus, the court stated in *Salahuddin*, that the defendant's believe that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's

19

mental state may be nonculpable." *Salahuddin* 467 F.3d at 28.

A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference. *Chance v. Armstrong*, 143 F.3d at 703. Nor does the fact that an inmate feels that he did not get the level of medical attention he deserved, or that he might prefer an alternative treatment, support a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) (citing *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir.1986)). Even negligence in diagnosing or treating an inmate's medical condition does not constitute deliberate indifference. *Farmer v. Brennan*, 511 U.S. at 835. Thus, any claims of medical malpractice, or disagreement with treatment are not actionable under Section 1983. *Ross v. Kelly*, 784 F. Supp. 35, 44-45 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir. 1992) (table).

## B.   Application

Plaintiff argues that the defendant doctors were deliberately indifferent to his serious medical needs when they discontinued his anti-HCV treatment for two weeks in January 2005. The defendants assume, for the purposes of this motion, that the interruption of plaintiff's treatment resulted in a degeneration of his condition sufficient to satisfy the objective prong of the Eighth Amendment standards for

medical care.  (Deft.s' Memo. of Law at 14-15, Dkt. No. 92-10).[15]  However, the

defendants argue, and the court agrees, that no reasonable jury could find that the

doctors acted with "deliberate indifference" by interrupting the anti-HCV medication

based on the defendants' medical judgment in applying the DOCS Guidelines to

plaintiff's particular clinical situation.  As discussed in section IV below, even if there

were an issue of material fact relating to the subjective prong of the Eighth

Amendment analysis, the defendant doctors would be entitled to summary judgment

based on qualified immunity, because it was objectively reasonable for them to believe

that discontinuing plaintiff's medication at the twelve-week treatment mark did not

constitute deliberate indifference to his particular medical needs.

Prison officials have broad discretion in determining the nature and character of

medical treatment afforded to inmates.  *Sonds v. St. Barnabas Hosp. Correctional*

*Health Services*, 151 F. Supp. 2d at 311.  An inmate does not have the right to

treatment of his choice.  *Ross v. Kelly*, 784 F. Supp. at 45 (citing, *inter alia*, *Dean v.*

*Coughlin*, 804 F.2d at 215).  In order to establish "deliberate indifference," plaintiff

must demonstrate more than a "negligent" failure to provide adequate medical care.

---

[15] Plaintiff alleges that his treatment ultimately failed because of the interruption of
anti-HCV medication; but he provides no medical support for this causal allegation, other than
the increase in his viral load after the two-week termination of his medication.  (Pltf.'s Decl.  ¶
18).  The court expresses no opinion as to whether the evidence adduced by plaintiff would be
sufficient to establish an issue of material fact with respect to whether the interruption in
treatment was a sufficiently "serious" under the objective prong of the Eighth Amendment
analysis.

*Salahuddin v. Goord*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 835-37).  Instead, plaintiff must show that the defendant acted with the equivalent of subjective recklessness.  *Id*.  (citing *Farmer*, 511 U.S. at 839-40).

The defendants have established that the decision to discontinue plaintiff's anti-HCV medication was based upon laboratory testing data, and was in accordance with DOCS Guidelines.  The guideline that medication should be stopped after twelve weeks if at least a 100-fold (two-log) decrease in viral load is not achieved, is not a capricious barrier to treatment for inmates.  Rather, that guideline is based upon national medical standards and recommendations, which  reflect the clinical judgment that the failure to achieve early viral response–a two-log decrease–after twelve weeks is predictive of, and deemed treatment failure.  Given the serious risks inherent in use of anti-HCV medications and the relatively slow rate of progression of Hepatitis-C in causing liver damage, the defendant doctors did not recklessly ignore plaintiff's serious medical needs by deciding to discontinue his treatment when his viral load did not respond to treatment to the extent called for by the DOCS Guidelines.  *See, e.g., Young v. Bresler*, Civ S-03-0951, 2006 WL 2091927, at *16 (E.D. Cal. July 26, 2006) (a  prison physician's determination to terminate HCV treatment cannot be considered deliberate indifference where inmate plaintiff's drop in viral load, while considerable, was less than a 100-fold (two-log) reduction, thereby evidencing treatment failure, in

22

the opinion of the physician).

As plaintiff points out, there was disagreement among the doctors as to whether plaintiff's medication should be continued based on the more than one-log reduction in his viral load after twelve weeks.[16]  However, "the law is clear that a difference of opinion . . . even among medical professionals themselves, as to the appropriate course of medical treatment does not in and of itself amount to deliberate indifference." *Williams v. M.C.C. Institution*, 97 CIV. 5352, 1999 WL 179604, at *7 (S.D.N.Y. Mar. 31, 1999) (citing, *inter alia*, *Ross v. Kelly*, 784 F. Supp. 35, 45).[17]

Plaintiff cites Second Circuit authority which indicates that there are

---

[16] As noted above, a pre-treatment consultant, Dr. Ashley, recommended that plaintiff's treatment should continue if at least a one-log decrease in viral load was achieved at the twelve-week mark.  The report of Dr. McDermott, who reviewed plaintiff's progress after eight weeks of treatment, referenced the two-log reduction standard consistent with the DOCS Guidelines.  Dr. Lee recommended continuing plaintiff's treatment based on his 1.34-log reduction in viral load at twelve weeks.  Dr. de Azevedo, who personally reviewed plaintiff's medical records and consulted with Dr. Wright, decided to stop plaintiff's treatment based on the two-log reduction standard.  However, defendants de Azevedo and Wright agreed to re-start plaintiff's medication, after further consultation with Dr. McDermott, who recommended continuing treatment on January 28, 2005.

[17] *See also Williams v. Smith*, 02 Civ. 4558, 2009 WL 2431948, at *9 (S.D.N.Y. Aug. 10, 2009) ("a prison doctor who relies on his medical judgment to modify or disagree with an outside specialist's recommendation of how to treat an inmate is not said to act with deliberate indifference"); *Gillespie v. New York State Dept. of Correctional Services*, 9:08-CV-1339 (TJM/ATB), 2010 WL 1006634, at *6, (N.D.N.Y. Feb. 22, 2010) (the fact that other physicians may have previously followed a different course of treatment does not render the actions of the prison doctor "deliberate indifference") (Report-Recommendation), adopted, 2010 WL 1006643 (N.D.N.Y. Mar 19, 2010); *Wright v. New York State Dept. of Correctional Services*, 06 Civ. 03400, 2008 WL 5055660, at *17 (S.D.N.Y. Oct. 10, 2008) (decision to prescribe medication in a manner different than that recommended by an outside specialist qualifies as an exercise of medical judgment and does not give rise to a constitutional violation).

circumstances under which a jury could conclude that the application of different aspects of the DOCS HCV Guidelines to deny treatment could constitute "deliberate indifference." *See, e.g., Johnson v. Wright*, 412 F.3d 398, 404 (2d Cir. 2005).  In *Johnson*, the court held that Dr. Lester Wright and other DOCS medical administrators were not entitled to summary judgment for denying anti-HCV medication to an inmate who had one positive test for marijuana use in the prior year, based on a DOCS guideline that allowed physicians to deny treatment to prisoners who show "'evidence of active substance abuse.'"  *Id.* at 401.  The court found that a jury could conclude that the defendants did know of and disregarded an excessive risk to plaintiff's health, in light of several circumstances, including:  (1) each of plaintiff's treating doctors advised the central DOCS medical staff that the denied medication was medically appropriate and (2) the defendant medical administrators did nothing to investigate or verify whether "it would be medically appropriate to ignore the unanimous advise of [the] treating physicians, including prison physicians . . . ."  *Id.* at 404.

Unlike *Johnson v. Wright*, where the treating doctors were all in agreement as to the appropriate treatment, there were differences of opinion among the treating and consulting physicians in this case as to whether the two-log reduction standard should be applied to stop medication in plaintiff Watson's case.  (See note 16, above).  Moreover, Dr. de Azevedo, following a request from plaintiff that the FHSD intervene

24

in his care, became actively involved in plaintiff's treatment and reviewed his medical records; the doctor did ***not*** "reflexively" apply the DOCS Guidelines without investigating  plaintiff's condition or applying his own medical judgment to the patient's particular situation.  *Id.* at 406.[18]  The court concludes that *Johnson v. Wright* is clearly distinguishable, and that no reasonable jury could find that the defendant doctors in this case acted with deliberate indifference in applying the DOCS HCV Guidelines to plaintiff Watson.

Many courts in this circuit have held that determinations as to whether to treat Hepatitis-C with interferon, pursuant to DOCS Guidelines, reflect medical judgments, not "deliberate indifference" under the Eighth Amendment.[19]  To the extent other cases

---

[18] In *Johnson*, the Second Circuit noted that there was no evidence that defendant Lester Wright reviewed the plaintiff's medical file; rather, the record strongly suggested that Dr. Wright "simply assumed the medical soundness of the following the Guidelines in plaintiff's case" notwithstanding the contrary advice from all of the treating doctors.  *Id.* at 406.

[19] *See, e.g.*, *Melendez v. Wright*, 9:05-CV-1614 (NAM/RFT), 2008 WL 4757360, at *5 (N.D.N.Y. Oct. 29, 2008) (Dr. Wright's determination that a  prisoner was ineligible for hepatitis-C treatment under DOCS Guidelines because he was at stage 0 fibrosis "implicate[s] medical judgments and, at worst, negligence amounting to malpractice, but not the Eighth Amendment"); *Tatta v. Wright*, 616 F. Supp. 2d 308, 313-14, 318 (N.D.N.Y. 2007) (Dr. Wright's decision to delay re-treatment of plaintiff with pegylated Interferon for 22 months until he qualified under a limited exception in the DOCS treatment policies, was neither unreasonable or indifferent); *Pabon v. Wright*, 99 Civ. 2196, 2004 WL 628784, at *7-8 (S.D.N.Y. Mar. 29, 2004) (conditioning and delaying prisoners' Interferon treatment pending the results of a liver biopsy amounted to no more than "a difference in opinion as to how defendants should have treated their Hepatitis C" and is "insufficient to satisfy the 'deliberate indifference' standard"); *Lewis v. Alves*, 01-CV-0640A, 2004 WL 941532, at *6-7 (W.D.N.Y. Mar. 22, 2004) (treatment of Hepatitis-C under DOCS guidelines including "the decision to prescribe interferon/ribavirin treatment is always dependent on the exercise of medical judgment.").

from this Circuit have concluded that application of the DOCS HCV Guidelines could

constitute an Eighth Amendment violation, they have addressed reflexive or

mechanical  reliance on other aspects of the DOCS Guidelines that are less clearly

correlated with treatment success.[20]

Plaintiff claims that, as a result of his interaction with Dr. de Azevedo on

December 22, 2004, the doctor denied him treatment based on retaliatory motives and

discriminatory animus.  However, this court concludes that, notwithstanding plaintiff's

conclusory allegations, no reasonable jury would find that Dr. de Azevedo's treatment

of plaintiff was based on retaliatory or discriminatory motives, as opposed to an

exercise of his medical judgment.[21]  First, there is no documentary corroboration of

---

[20] *See, e.g., Salahuddin v. Goord*, 467 F.3d at 281 ("We cannot, as a matter of law, find it reasonable for a prison official to postpone for five months a course of treatment for an inmate's Hepatitis C because of the possibility of parole without an individualized assessment of the inmate's actual chances of parole."); *Hatzfeld v. Eagen*, 9:08-CV-283 (LES/DRH), 2010 WL 5579883, at *12, 13 (N.D.N.Y. Dec. 10, 2010) (finding question of fact as to whether there was deliberate indifference by the defendants in conditioning plaintiffs HCV treatment on compliance with DOCS policy requiring inmates to first participate in substance abuse treatment program, but granting summary judgment on grounds of qualified immunity in any event); *Verley v. Wright*, 02 Civ. 1182, 2007 WL 2822199, at *2, 11, 14 (S.D.N.Y. Sept. 27, 2007) (a fact finder could conclude that defendant Wright exhibited deliberate indifference by denying plaintiff HCV medication because of two prior incidents of drug use, notwithstanding several subsequent negative drug tests; however the defendant was entitled to summary judgment based on qualified immunity).

[21] Any allegations that the defendants were influenced by a grievance plaintiff filed or other non-medical reason are appropriately considered within the ambit of the subjective intent inquiry of the explicit Eighth Amendment claim.  *See Hardy v. Diaz*, 9:08-CV-1352 (GLS/ATB), 2010 WL 1633379, at *6 n.11 (N.D.N.Y. Mar. 30, 2010) (Report-Recommendation), adopted, 2010 WL 1633390 (N.D.N.Y. Apr. 21, 2010).  Claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration."  Accordingly, plaintiff must set forth non-conclusory allegations to survive

plaintiff's claim that he filed a grievance against Dr. de Azevedo for allegedly making

a racially derogatory remark until after plaintiff learned that the doctor might

discontinue his treatment.  (See note 9, above).  The contemporaneous  medical

records and disciplinary records relating to the incident do not support plaintiff's

belated assertion that there were racial issues involved in his brief interaction with Dr.

de Azevedo on December 22nd.  (Dkt. No. 93 at 11; Pltf.'s Exh. G, Dkt. No. 96-1 at 28-

29; Pltf.'s Ex. I, Dkt. No. 96-2 at 2-3; de Azevedo Decl. ¶¶ 47-51).  Plaintiff's

conclusory claims that his treatment was denied for retaliatory or racial reasons are

insufficient to create a material issue of fact relating to the subjective prong of the

Eighth Amendment standards for medical care.  *See, e.g., DiChiara v. Wright*, 06-cv-

6123, 2011 WL 1303867, at *10 (E.D.N.Y. Mar. 31, 2011) (given the lack of evidence

to suggest that Dr. Wright had an unconstitutional motive for denying plaintiff's

Hepatitis-C treatment, the defendant was entitled to summary judgment on the claim

that the doctor delayed his treatment out of deliberate indifference); *Jeffreys v. City of*

*New York*, 426 F.3d 549, 554 (2d Cir. 2005) ("While it is undoubtedly the duty of

district courts not to weigh the credibility of the parties at the summary judgment

---

dismissal of a claim sounding in retaliation.  *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003).
*See also Lashley v. Wakefield*, 367 F. Supp. 2d  461, 469 (W.D.N.Y.2005) (plaintiff's allegation
that defendant had said that plaintiff was the "asshole" that worked in the law library and who
had given him a "hard time" during a library shift he worked a few weeks earlier, could not,
standing alone, support a finding that defendant filed subsequent inmate misbehavior report in
retaliation for plaintiff's work as a law clerk).

stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' . . . and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.") (citation omitted).[22]

When plaintiff continued to protest the termination of his medication,  Dr. de Azevedo promptly reconsidered the decision which his superior had approved, consulted again with other doctors, and resumed treatment, all within two weeks.  No reasonable fact finder would conclude that a doctor who was acting with a retaliatory or discriminatory intent would have responded to plaintiff's strident, continuing complaints by promptly re-evaluating the treatment plan.  While there may be a question as to whether the two-week delay in plaintiff's medication constituted malpractice, which would not be material in this section 1983 action, there is no issue that the defendant doctors were applying their unbiased medical judgment, not acting

---

[22] *See also Brown v. White*, 9:08-CV-200 (GLS/ATB), 2010 WL 985184, at *8 (N.D.N.Y. Mar. 15, 2010) (plaintiff's conclusory suggestion that defendant nurse completely refused to provide any medical attention on a particular date is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record) (citing, *inter alia*, *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case")); *McCloud v. Roy*, 9:08-CV-839 (LEK/ATB), 2010 WL 985731, at *7 (N.D.N.Y. Feb. 22, 2010) (plaintiff's conclusory allegation that he requested a bottom bunk placement from prison doctor is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record) (Report-Recommendation), adopted, 2010 WL 985737 (N.D.N.Y. Mar 16, 2010).

with deliberate indifference.

In relying on the DOCS HCV Guidelines, Dr. de Azevedo provided rational, medically-based reasons for stopping plaintiff's medication. Even if plaintiff had made a showing of retaliatory or discriminatory motive, defendants would avoid liability under section 1983 because they have demonstrated that they would have made the same treatment decision, even in the absence of the allegedly improper motivation. *See Lowrancey v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994) (the Supreme Court held that, in cases in which state action is motivated by both proper and improper reasons, the action may be sustained if it would have been taken even in the absence of the improper reason) (citing *Mount Healthy Sch. Dist. v. Doyle*, 429 U.S. 274, 287 (1977); *Bennett v. Goord*, 343 F.3d at 137 (DOCS defendants may avoid liability on a section 1983 retaliation claim if they demonstrate that they would have taken the same adverse action against the plaintiff even if he had not engaged in protected conduct).

## IV.   Qualified Immunity

Defendants argue that, even if plaintiff's Eighth Amendment claim was not dismissed outright, they would nevertheless be entitled to qualified immunity from plaintiff's claim for money damages, which is the only form of relief plaintiff seeks on this claim. The court agrees.

A.    **Legal Standards**

Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In evaluating whether a right was clearly established at the time a civil rights defendant acted, the court must determine: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and, (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful." *African Trade & Information Center, Inc., v. Abromaitis*, 294 F.3d 355, 360 (2d Cir. 2002) (citations omitted). Even if the constitutional privileges are clearly established, a government actor may still be shielded by qualified immunity "if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir. 1991) (citing *Magnotti v. Kuntz*, 918 F.2d 364, 367 (2d Cir.1990).

In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "If no constitutional right would

have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.*  However, the Supreme court later held, in *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 812, 818 (2009), that, "while the sequence set forth [in Saucier] is often appropriate, it should no longer be regarded as mandatory in all cases."

B.   **Application**

Even if plaintiff had raised some material issue of fact relating to his Eighth Amendment claim, the defendants are still entitled to summary judgment and dismissal of plaintiff's claim for money damages on grounds of qualified immunity.  It was objectively reasonable for the defendants to believe that applying the DOCS Guidelines to discontinue plaintiff's anti-HCV treatment in his particular clinical circumstances, did not constitute deliberate indifference to his medical needs.

As discussed above, the defendant doctors have established that it was objectively reasonable for them to believe that stopping plaintiff's anti-HCV medication when his viral load was not reduced by 100-fold after twelve weeks, was a medically-appropriate judgment.  The defendants' treatment decision was based upon the  DOCS Guidelines, which, in turn, reflect national medical standards and recommendations concerning the likelihood of treatment failure.  While different doctors disagreed as to the appropriate course of treatment, the defendant doctors did

not apply the DOCS Guidelines reflexively, but appropriately considered plaintiff's particular circumstances before deciding to discontinue his treatment.  Under the circumstances, defendants de Azevedo and Wright are entitled to qualified immunity. *See, e.g.*, *DiChiara v. Wright*, 2011 WL 1303867, at *11-12 (defendant doctors were entitled to qualified immunity because it was objectively reasonable for them to believe that following nationally recognized Hepatitis-C treatment guidelines did not amount to deliberate indifference, notwithstanding the contrary recommendations of some treating physicians); *Verley v. Wright*, 2007 WL 2822199, at *14 (because reasonable prison medical officials could have concluded that denial of Hepatitis-C treatment pursuant to the DOCS policy then in effect was not unlawful, defendant was protected by qualified immunity);  *Hatzfeld v. Eagen*, 2010 WL 5579883, at * 13 (finding that it was objectively reasonable for doctors to believe that conditioning inmate's HCV treatment on participation in substance abuse counseling, pursuant to DOCS guidelines, did not violate the prisoners' constitutional rights).[23]

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendant's motion for summary judgment (Dkt. No.

---

[23] Plaintiff cites *McKenna v. Wright*, 386 F.3d 432 (2d Cir. 2004) in opposition to defendants' arguments regarding qualified immunity.  However, that case is readily distinguishable because it was in the context of a motion to dismiss, not a summary judgment motion.  *Id.* at 437 (however the case may stand at the summary judgment stage, the complaint should not be dismissed at the pleadings stage on the basis of qualified immunity).

92), be **GRANTED**, and the complaint **DISMISSED IN ITS ENTIRETY**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have

fourteen (14) days within which to file written objections to the foregoing report.

Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT**

**TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE**

**APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing

*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28

U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.


Dated: August 4, 2011


Hon. Andrew T. Baxter
U.S. Magistrate Judge

33